Laurence F. Padway, #89314
Law Offices of Laurence F. Padway
1516 Oak Street, Suite 109
Alameda, California 94501
Telephone:  (510)814-6100
Facsimile : (510)814-0650


Attorneys for plaintiff
        Fadi G. Haddad, M.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FADI G. HADDAD, M.D.,                          No. C 16-01700 WHO

                                               **PLAINTIFF'S OPENING**
                                               **BRIEF RE: RULE 52**
                Plaintiff,
        vs.

SMG LONG TERM DISABILITY PLAN, AND             Date: July 17, 2017
HARTFORD LIFE AND ACCIDENT                     Time: 2:00 p.m.
INSURANCE COMPANY,

                Defendants.
_____/

**TABLE OF CONTENTS**

| | |
|---|---|
| Table of Authorities | ii-iii |
| Motion | 1 |
| Memorandum of Points and Authorities | 2 |
| 1.  Introduction. | 2 |
| 2.  The Standard of Review is De Novo. | 3 |
| 3.  Dr. Haddad is and has been Unable to Work on Reasonably Continuous Basis from March 5, 2015 until the Present. | 3 |
| 4.  Dr. Haddad's Claims are Not Subject to the Pre-Existing Condition Exclusion. | 5 |
| 5. This Court Should Award Benefits Through the Entry of Judgment. | 14 |
| 6. Interest. | 17 |
| 7. Computations of amounts due. | 19 |
| 8.  Conclusion. | 21 |

1

**TABLE OF AUTHORITIES**

2

**CASES**

*Alfano v. CIGNA Life Ins. Co. of New York*,
2009 U.S. Dist. LEXIS 28118  (S.D.N.Y., 2009)     19

*Amaato v. Bernard,*
618 F. 2d 559 (9th Cir., 1980)     15

*Billings v. Cont'l Cas. Co.,*
2003 U.S. Dist. LEXIS 796 (N.D.Ill., 2003)     19

*Blanton v. Anzalone*,
813 F. 2d 1574 (9th Cir., 1987)     18

*Dishmanv. UNUM Life Ins. Co. of Am.*,
269 F.3d 974  (9th Cir.2001)     17, 18

*Fought v. Unum Life Insurance Co. of America*,
379 F.3d 997 (10th Cir. 2004)     9

*Grosz-Salomon v. Paul Revere Life Insurance*,
237 F.3d 1154  (9th Cir., 2001)     18-19

*Hansen v. Continental Ins. Co.*,
940 F.2d 971  (5th Cir., 1991)     19

*Kunin v. Benefit Trust Life Ins. Co.*,
910 F.2d 534 (9th Cir.) (as amended), cert. denied, 498 U.S. 1013     8

*McLeod v. Hartford Life and Accident Ins.Co.,*
372 F. 3d 618 (3rd Cir., 2004)     10

*McClure v. Life Ins. Co. of N. Am.,*
84 F.3d 1129 (9th Cir., 1966)     8

*Nightingale v. Blue Cross/Blue Shield of Alabama*,
41 F.3d 1476 (11th Cir., 1995)     19

*Oliver v. Coca Cola Company*,
497 F.3d 1181 (11th Cir. 2007)     17

*Omasta v. Choices Benefit Plan,*
352 F. Supp. 2d 1201(D. Utah 2004)     19

*Orzechowski v. Boeing Co., etc.,*
856 F. 3d 686 (9th Cir., 2017)     3

*Paese v. Hartford Life & Accident Ins. Co.*
449 F.3d 435 (2nd Cir 2006)     17

*Quesinberry v. LINA*,
987 F.2d 1017 (4th Cir. 1993)(en banc)     19

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Radford Trust v. First Unum Life*,
321 F. Supp.2d 226 (D. Mass. 2004)                                    19

*Smith v. CMTA-Iam Pension Trust,*
746 F. 2d 587 (9th Cir., 1984)                                       22

*Smith v. Metro Life Ins. Co.,*
274 Fed. Appx. 251 (4th Cir. N.C. 2008)                              17

*Vaught v. Scottsdale Healthcare Corp. Health Plan,*
546 F. 3d 620 (9th Cir., 2008)                                     15, 16

*Western Pacific Fisheries, Inc. v. SS President Grant*,
730 F. 2d 1280 (9th Cir., 1984)                                    18-19

*Wilden v. Washington National Ins. Co.,*
18 Cal. 3d 631 (1976)                                                8

*Wright v. Raytheon  Co. Short Term Disability Plan,*
2008 U.S. Dist. LEXIS 81951 (D.Ariz. Sept.17, 2008)                  17

**FEDERAL STATUTES**

29 C. F. R. 2560.503-1(h)(3)(v)                                       7

**MOTION**

Plaintiff Fadi Haddad moves for judgment as follows:

1.  For short term disability benefits according to proof or in the sum of $77,142.85;

2. For long term disability benefits according to proof, or in the sum of $600,000, through September 1, 2017 (estimated date of entry of judgment);

3. For reduction of the above amounts for an SDI offset in the sum of $45,894.84;

4. For prejudgment interest at the rate of 10 per cent per annum, compounded annually;

5. For costs and fees to be awarded as provided by F. R. C. P., Rule 54.

6.  For a declaration that the disability payments due under the plan are not subject to the pre-existing condition limitation.

8. For a declaration that Dr. Fadi Haddad is, as of the entry of judgment herein, unable to work at his regular occupation as a pediatric gastroenterologist on a reasonable and continuing basis.


Dated:  June 5, 2017          /s/ Laurence F. Padway
                              Attorney for Fadi G. Haddad, M.D.

1

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

    **1.  Introduction.**

3

        Dr. Fadi Haddad, a pediatric gastroenterologist, born on April 28, 1966 (AR 1008)

4

began working for Sutter Medical group on July 28, 2014.  At that time he had some **non-disabling**

5

**right side** arm and thumb symptoms from a cervical disc herniation and radiculopathy.  On March 5,

6

2015, Dr. Haddad underwent an anterior cervical diskectomy at C5-6 with placement of an artificial

7

disk.  The surgery successfully resolved the right side symptoms. Although the operative report, and

8

imaging done during surgery shows the artificial disk was properly placed and fitted, AR at 841-

9

842), it later "flexed" as shown on x-rays taken on March 23, 2015.  While this is not normal, the

10

surgeon, on consultation with industry experts, believed the disc placement was adequate.  In the

11

weeks and months following the March 5, 2015 surgery, and because of it,  Dr. Haddad developed a

12

**disabling left side** C6 radiculopathy.  AR 543-544.

13

14

        Dr. Haddad applied for disability benefits, which Hartford denied, except for six

15

weeks of short term disability which is paid despite application of a pre-existing condition

16

limitation.[1] AR 39-41, denial letter dated November 12, 2015.  The sole basis for the denial was that

17

Hartford claimed the right sided nondisabling symptoms were a pre-existing condition with respect

18

to the left sided disabling conditions which developed as an unexpected consequence of the March 5,

19

2015 surgery.  We do not contest that Dr. Haddad had a C5-6 radiculopathy which produced right

20

21

     [1] On January 12, 2016, we requested that defendants produce the plan document, and the insurance policies. AR 924-927.  Instead of producing those, defendants produced a booklet entitled "Your Benefit Plan," which contains a number of "Certificates" of insurance. The Certificates state that "[t]he provisions of the Participating Employer's coverage under The Policy, which are important to You, are **summarized** in this certificate consisting of this form and any additional forms which have been made a part of this certificate...**The Policy alone is the only contract under which payment will be made.** Any difference between The Policy and this certificate will be settled according to the provisions of The Policy on file with Us at Our home office." AR 1069, 1095, 1127. [Emphasis added] We do not believe that the defendants can establish that the terms of the pre-existing condition clause in the certificate is the same as that in the policy without having produced the policy.  Nor can defendants prove that either the policy or the certificates control without producing the plan document, which is identified at AR 1152, but not produced.  While we quote from the certificates throughout this pleading, this is because the defendants continue to refuse to produce the plan document and the insurance polic(ies), and our reliance on the certificates is not a concession that they are the controlling documents, since plainly they are not.

22

23

24

25

26

27

28

sided symptoms during the "look back" period for pre-existing conditions. Because the pre-existing

condition clauses, as applied by Hartford, would be effective with respect to both short term and long

term disability benefits, and because Hartford acknowledges that Dr. Haddad is, in fact, disabled, we

request the Court to award both short term and long term disability benefits up through September 1,

2017, which we anticipate to be the approximate date of entry of judgment.

**2.  The Standard of Review is DeNovo.**

The standard of review is de novo, because California Insurance Code 10110.6 voids

any grant of discretion.  *Orzechowski v. Boeing Co., etc.,* 856 F. 3d 686 (9th Cir., 2017).

**3.  Dr. Haddad is and has been Unable to Work on Reasonably Continuous Basis**
**from March 5, 2015 until the Present.**

Dr. Haddad was hired by Sutter Medical Group on July 28, 2014.  He stopped work

on March 5, 2015 to undergo surgery, expecting to return to work. AR 1058.  Dr. Bobby Tay, who

performed a second surgery on Dr. Haddad in August, 2015, did such an excellent job of

summarizing the medical history in his letter of May 5, 2016, AR 541-542, that we quote it in its

entirety (we have added footnotes where we believe citations to other records would be useful):

> Dr. Fadi G. Haddad suffered from a right arm radiculopathy in the C6
> distribution, down to the right thumb, beginning in the fall of 2013.
> Physical therapy, including traction, was ineffective. There was no
> weakness associated with this, and it did not prevent Dr. Haddad from
> working as a Pediatric Gastroenterologist. Over the next year, he
> continued to have paresthesias and numbness mostly in the lateral
> posterior aspect of the arm, lateral forearm, down to the right thumb
> and index finger.  This was not accompanied by a lot of pain and he
> took occasional NSAIDs for the pain which occurred. Physical exam
> on 1/13/15 was remarkable for a positive Spurlings on the right side.
> This is a maneuver used to assess nerve root (radicular) pain.
>
> Serial MRI's, the latter on November 23, 2014 were essentially the
> same and showed some foraminal stenosis on the right side, variously

described as mild to moderate to severe.[2] There was a posterior disc spur complex to the right of midline which abutted the spinal cord. This was variously read as either possibly or definitely compressing the exiting right C6 nerve. Right foraminal encroachment due to uncinate spurring was also noted. This pathology explains right arm and hand symptoms, but would not produce left arm symptoms, and there were no left side symptoms.

In January, 2015, it was decided to perform surgery with cervical decompression which was done on March 5, 2015. Surgery included a disc replacement, and a post-surgery x-ray on 3/23/15 showed that the replacement disk was "flexed," which is not normal.[3] On consultation with industry experts, the surgeon felt the disc placement was adequate. The surgery was successful in relieving 95% of the right sided symptoms.

However, following this surgery left side symptoms first appeared. These include left sided neck pain, left upper back and left shoulder paresthesias, with some paresthesias in the left 3rd and 4th digits. The symptoms were so severe as to prevent Dr. Haddad from working as a pediatric gastroenterologist. Primarily, this is because the hand symptoms prevent Dr. Haddad from charting and examining patients with the speed required in a busy clinical practice. He could return to work on a part time basis if he was allowed extra time (60 minutes instead of 30 minutes) to see each patient and had an assistant assigned to him to handle the charting and other paperwork. He would also need a break of 10- 15 minutes every two hours to lie down, and lifting would need to be limited to 20 pounds. Dr. Haddad needs assistance in intake and documentation to avoid repeated strain to the neck which exacerbates the symptoms and to avoid interfering with the fusion healing process. Tasks affected include flexion of neck during charting, patient examination, procedures, carrying/lifting equipment, moving patients on exam tables and in operating rooms. The appearance of these left side symptoms post surgery is documented on EMG which shows a left side C6 lesion, which was not present on imaging done prior to the March 5, 2015 surgery. It appears that there was a left side nerve root injury which occurred during the March 5, 2015 disc replacement surgery. It is these left sided symptoms which caused Dr. Haddad to become unable to perform the material duties of his work on a regular and consistent basis.

There is no evidence of any left sided symptoms prior to March 5, 2015. It appears that these are caused by and related to the surgery done on that date.

---

[2] The November 23, 2014 MRI report is at AR 196-198 and 215-216.

[3] Flouroscopy done during the procedure showed proper alignment of the artificial disc, and the surgeon described it as a good fit, after trial spacers were used to measure the fit. Procedure Report. AR 611-612.

Thank you.

Bobby Tay, M.D.
Associate Professor
UCSF Spine Center
Department of Orthopedic Surgery

Dr. Tay attempted to fix these left sided problems on August 20, 2015, by removing the artificial disk, and changing the entire anatomy of the affected area by performing a fusion with anterior plating.  AR 500, 504.  Unfortunately, as documented in his letter of May 5, 2016 (AR 541-542), this surgery was not successful enough to permit Dr. Haddad to return to work, except with accommodations which his employer found unacceptable.  Prior to the March 5, 2015 surgery, Dr. Haddad worked 40 hours a week and had an after hours call schedule. AR 1058.

As a result of Dr. Haddad's inability to work, he lost his job with Sutter.  Because he was discharged by Sutter, he became eligible to convert his group LTD coverage to a personal disability plan.  AR 1101.  But when he attempted to do this, the conversion was denied because Hartford determined that "[a] disability is preventing you from performing your occupation," and "[y]ou are not eligible for this Group LTD conversion privilege when your employment ends due to a disability.  Therefore, Long Term Disability conversion coverage is not available to you."  AR 921, Hartford letter to Dr. Haddad dated December 16, 2015, returning check in payment of premium on the conversion policy.  Accordingly, Hartford was in agreement as of December 16, 2015, that Dr. Haddad remained disabled following his surgery of March 5, 2015 and the fusion he underwent on August 20, 2015.

### 4.  Dr. Haddad's Claims are Not Subject to the Pre-Existing Condition Exclusion.

Sutter provides both short term and long term disability insurance through Hartford. The certificate of insurance shows that eligibility for benefits starts with Dr. Haddad's date of hire which was July 28, 2014 (AR 3).  The short term plan provides that if a period of disability is extended by a new cause of disability while benefits are payable, the short term benefits will

continue to their maximum 22 week payment.  AR 1074.

The short term disability certificate contains a limitation on pre-existing conditions which reads (AR 1075):

> We will only pay benefits, or an increase in benefits, under The Policy for any Disability that results from, or is caused or contributed to by, a Pre-existing Condition for up to 6 week(s), unless, at the time You become Disabled:
>
> 1) You have not received Medical Care for the condition for 6 consecutive month(s) while insured under The Policy; or
> 2) You have been continuously insured under The Policy for 12 consecutive month(s).
>
> Pre-existing Condition means:
>
> 1) any Injury, Sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
>
> 2) any manifestations, symptoms, findings, or aggravations related to or resulting from such Injury, Sickness, Mental Illness, pregnancy, or Substance Abuse;
>
> for which You received Medical Care during the 6 month(s) period that ends the day before:
>
> 1) Your effective date of coverage; or
>
> 2) the effective date of a Change in Coverage.

The long term policy certificate has a 180 day elimination period, the same effective date as the short term policy (AR 1097) and provides coverage if Dr. Haddad is unable to work in his "own occupation."  The certificate expressly defines "own occupation" to include the specialty certification which Dr. Haddad holds as a pediatric gastroenterologist.  AR 1082-1083.  The pre-existing condition limitation under the long term policy differs from the limitation under the short term certificate only in that the short term policy looks at the medical care in the six months before the disability starts, or before the coverage starts, and the Long Term certificate shortens that to three months. AR 1105.  This distinction makes no difference because there was medical treatment in the

month before the coverage started, as Dr. Haddad was seen at UC Davis on July 1, 2014 for "mild right sided C6 symptoms from right sided C5-6 disc herniation." X-rays were taken that day and physical therapy was recommended. AR 487. There was no three month period without medical care between July 28, 2014 and March 5, 2015.

There is no evidence that the cervical radiculopathy or the C5-6 disc herniation was disabling prior to the surgery on March 5, 2015. There is undisputed evidence that the artificial disc was in appropriate position at the time of surgery but that, by March 23, it had flexed. There is likewise undisputed evidence that prior to surgery, there was no evidence of a left C6 radiculopathy, but that post-surgery, one was shown on EMG. See report of Dr. Bobby Tay, May 5, 2016, AR 543-544.

There is no evidence of any left sided symptoms, or treatment of those, prior to the March 5, 2015 surgery. *Ibid.* And because defendants never asked a physician to review the medical issues either prior to making their initial denial (AR 39) or prior to denying the claim on administrative appeal (AR34), in violation of 29 C. F. R. 2560.503-1(h)(3)(v), defendants cannot dispute Dr. Tay's opinion that the left sided disabling conditions arose as a complication of surgery and did not exist prior to the surgery.

Anatomically, the first surgery eliminated the right sided disc herniation and radiculopathy at C5-6, because it removed the disc and replaced it with an artificial device. Because the right sided symptoms had been caused by the disc herniation and resulting radiculopathy, and the disc was removed in the March 5, 2015 surgery, neither the disc herniation nor the resulting radiculopathy existed after that surgery. Accordingly, nothing that occurred after the March 5, 2015 surgery can be said to "result[s] from, or is caused or contributed to by," the condition which existed prior to March 5, 2015. For the same reason, the August 20, 2015 surgery again re-did the anatomy. The artificial disc was removed, and a fusion was done, with hardware to assure that the proper

1    spacing between discs was maintained.  Accordingly, even if one could argue that some injury or

2    illness which existed prior to March 5, 2015, somehow caused left sided symptoms, there is nothing

3    which remained of the anatomy causing the symptoms prior to March 5, 2015.

4

5        Accordingly, the exclusion for pre-existing conditions does not apply under either the

6    short term or long term coverage.  As that was the sole reason asserted for denying the claim, the

7    Court should award both short term and long term benefits.

8

9        ERISA insurance policies are governed by the rule that ambiguous language is

10   construed against the insurer and in favor of the insured. *Kunin v. Benefit Trust Life Ins. Co.*, 910

11   F.2d 534, 539-40 (9th Cir.) (as amended), cert. denied, 498 U.S. 1013,  *McClure v. Life Ins. Co. of*

12   *N. Am.*, 84 F.3d 1129, 1134 (9th Cir., 1966).  In this case, where the defendants have refused to

13   produce the actual policies and the plan document, broader latitude should be granted to Dr. Haddad

14   because of the inherent lack of precision caused by forcing reliance on summary documents instead

15   of the actual policies and plan document. (See footnote 1).

16

17       In *McClure v.Life Insurance Co. of N. Amer.,* 84 F. 3d 1129, 1135 (9th Cir., 1996), the

18   insured, a fire fighter, had a pre-existing back condition.  He tripped over a guide wire and

19   accidentally fell.  Prior to this accident, McClure had complained of right side lateral thigh pain with

20   numbness and tingling and low back pain. He had been seeing a neurosurgeon, who had suggested

21   that McClure undergo an MRI of the low back twelve days before the fall.  McClure testified,

22   without dispute, that he had not modified his work duties prior to the fall.  The day after the fall,

23   McClure saw his physician but did not mention the fall, and he continued working.  He was unable

24   to perform the physical duties of his job, but continued to do light work.  Almost a year after the fall,

25   McClure was forced to stop working as no light duty was available.  McClure went on to become

26   totally disabled, and the parties stipulated that the fall had set in motion a deterioration which

27   resulted in his total disability.  The trial court found that McClure's disability was the result of a

28   "process of nature," and McClure was entitled to benefits despite his pre-existing condition because

the fall was the proximate cause of his disability. "Under the 'process of nature' rule, a claimed

disability is considered to have occurred immediately within the meaning of a total disability policy

provision when it follows directly from the accidental injury within the time the process of nature

takes." *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1133 (9th Cir., 1996).  See *Wilden v.*

*Washington National Ins. Co.,* 18 Cal. 3d 631, 635 (1976) ("the onset of disability relates back to the

time of the accident 'whenever the disability arises directly from the accident [and] within such time

as the process of nature consumes in bringing the person affected to a state of total [disability].'" A

policyholder who is injured during the policy period and slowly deteriorates over several years may

be covered even though he became totally disabled after the policy expired.).

In *McClure*, at 1133, the Ninth Circuit held the "process of nature" rule applied to

ERISA cases under federal common law.  Further, "[e]ven without relying on the "process of nature"

rule, under the stipulation and the undisputed facts, and applying general federal rules of contract

interpretation, the Ninth Circuit held that McClure was continuously and totally disabled

immediately following the accident, and permanently and totally disabled within one year."

*Ibid.*  The insurer argued that it only insures against loss "resulting directly and independently from

all other causes from bodily injuries caused by accident."  It argued that McClure's pre-existing back

condition meant that his disability was not independent of the accidental fall.  The Ninth Circuit

noted that it did not have the actual insurance policy in the record, and therefore could not discern

whether the limitation was conspicuous.  It therefore held in the alternative:

> "...we hold that if the exclusionary language here in question is
> conspicuous it would bar recovery if a preexisting condition
> substantially contributed to the disability. This could result in a denial
> of recovery even though the claimed injury was the predominant or
> proximate cause of the disability. On the other hand, we hold that if the
> language is inconspicuous, a policy holder reasonably would expect
> coverage if the accident were the predominant or proximate cause of
> the disability.
>
> *McClure v. Life Ins. Co. of N. Am.*,

1    84 F.3d 1129, 1136  (9th Cir., 1996)

2    *McClure* further holds, with respect to a different issue, that "[w]e interpret terms in

3    ERISA insurance policies in an ordinary and popular sense as would a [person] of average

4    intelligence and experience." And ambiguous language in an insurance policy is construed in favor

5    of the insured. *Id.*, at 1134.

6

7    In  *Fought v. Unum Life Insurance Co. of America*, 379 F.3d 997 (10th Cir. 2004).

8    Ms. Fought had a preexisting condition of coronary heart disease, for which she underwent surgery.

9    After the surgery, a chain of events ultimately resulted in the plaintiff contracting a staph infection

10   that left her disabled. The Court ruled that plaintiff's coronary heart disease did not "contribute to"

11   her disability, and thus did not justify denial of benefits under the policy's preexisting condition

12   exclusion. The Court held that exclusions must be interpreted narrowly, and therefore there must be

13   more than simple "but for" causation to demonstrate that a preexisting condition "contributed to" a

14   disability: The exclusion cannot merely require that the pre-existing condition be one of a series of

15   factors that contributes to the disabling condition; the disabling condition must be substantially or

16   directly attributable to the pre-existing condition.  Ms. Fought's staph infection is not a condition

17   related to her coronary artery disease, even though her unstable angina, which was related to her

18   coronary artery disease, undoubtedly contributed to the need for surgery.

19

20   In *McLeod v. Hartford Life and Accident Ins.Co.,* 372 F. 3d 618 (3rd Cir., 2004),

21   Hartford's language was reviewed.  The plan participant had pre-existing symptoms which at the

22   time were of unknown cause, but after the coverage began, she was diagnosed with MS, and in

23   hindsight, the earlier symptoms were attributable to the MS.  The Court held:

24

25       The language at issue before us revolves around the meaning of two
         terms: 'for' and 'symptom.' The Hartford Plan defines neither. We
26       have already undertaken the analysis of 'for' in  Lawson, 301 F.3d 159.
         There, Elena Lawson was taken to the emergency room two days
27       before her insurance policy became effective, for what was initially
         diagnosed as a respiratory tract infection. One week later, after the
28       effective date of her policy, she was correctly diagnosed as having

leukemia. The insurance company denied coverage of medical expenses relating to the leukemia on the ground that it was a pre-existing condition for which Lawson received treatment prior to the effective date. Lawson's parents, acting on her behalf, sued for breach of contract and we affirmed the District Court's grant of their motion for summary judgment.

The Lawson panel framed the issue in the following way: 'The central issue in this case is whether receiving treatment for the symptoms of an unsuspected or misdiagnosed condition prior to the effective date of coverage makes the condition a pre-existing one under the terms of the insurance policy. In other words, we must determine whether it is possible to receive treatment 'for' a condition without knowing what the condition is.'  Id. at 162.

Addressing this issue, the Lawson panel held that the word 'for' 'has an implicit intent requirement' and that 'it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists.'  Id. at 165. In reaching this conclusion, the Court engaged in a detailed analysis of other courts' renderings of the word 'for' in similar contexts, noting that although there are differing readings of what constitutes receiving treatment 'for' a condition, the word 'for' itself must, by definition, include a notion of intentionality. See id. ('for' is 'used as a function word to indicate purpose" (quoting Webster's Ninth New Collegiate Dictionary 481 (1986))).

As quoted above, the Plan at issue here defines a pre-existing condition, in relevant part as:

(2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse;

*for*  which you received Medical Care during the 90 day period that ends the day before:

(1) your effective date of coverage  (italics supplied).

McLeod contends that in order to have been properly denied coverage under the Plan, she would have had to receive care from a physician *for* the MS or *for* the 'manifestations, symptoms, findings, or aggravations' of MS during the look-back period. She submits that intentionality is a key component of receiving medical care and that the presence of the word 'for' in the policy language is crucial.

In  Pilot Life Insurance. Co. v. Dedeaux, 481 U.S. 41, 56, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987), the Supreme Court noted that Congress intended that 'a federal common law of rights and obligations under ERISA-regulated plans would develop.' Importing and extending the logic of Lawson, a contract case, into the ERISA context, is consistent with that teaching. Finding the  Lawson analysis persuasive, we

construe the term 'for' to contain the Lawson element of intentionality. Given that construction, Hartford's interpretation must be rejected at all events, and certainly when a heightened standard of review applies.

B.

If McLeod's case presented nothing more than a dispute over whether she had received treatment for MS (as opposed to the symptoms of MS), then the only question before us would be whether we could apply the straightforward logic of Lawson to an ERISA case where the heightened Pinto review obtains. ...There is, however, one significant difference between McLeod's case and the one presented in Lawson: Here, the policy language is more precise and encompasses a broader range of elements in its definition of what constitutes a pre-existing condition than did the policy at issue in Lawson.

In the Plan at issue here, a pre-existing condition includes medical care received for any 'manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse' (emphasis added) as opposed to the policy at issue in Lawson which defined a pre-existing condition as a 'Sickness, Injury,  disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician' during the relevant look-back period. Lawson, 301 F.3d at 161. [Fn omitted]

 Hartford places great stock in the difference in the language of the two policies, arguing that 'unlike the Plan in this case, the Lawson policy's definition of pre-existing condition did not encompass treatment for symptoms of a sickness.' At first blush, this distinction seems noteworthy, and the fact that the Hartford Plan includes words such as 'manifestations' and 'symptoms,' which the policy at issue in Lawson did not, seems potentially significant. [fn omitted] The District Court certainly thought that to be the case when it stated that: 'The Plan does not require that a participant's disabling condition be diagnosed within the look-back period in order for it to be considered a 'Pre-Existing Condition'; rather, it merely requires that a participant receive medical care for a symptom or manifestation of the condition during the look-back period.' McLeod v. Hartford Life & Accident Ins. Co., 247 F. Supp. 2d 650, 660 (E.D. Pa. 2003). The Court explained that it was 'eminently reasonable for Hartford to conclude that when Plaintiff sought treatment from Dr. DiGregorio for numbness in her left side in February 1999, Plaintiff sought treatment for a 'manifestation'  or 'symptom' of her MS.' Id. We disagree.  As stated above, Hartford does not define the term 'symptom.'  A dictionary definition of the word 'symptom' reads:

Symptom: 1. Med. A functional or vital phenomenon of disease; any perceptible change in any organ or function due to morbid conditions or to morbific influence, especially when regarded as an aid in diagnosis. Symptoms differ from signs in the diagnosis of a disease in that the former are functional phenomena, while the latter are

incidental or experimental.

2. That which serves to point out the existence of something else; any sign, token, or indication.

Funk & Wagnalls New Standard Dictionary of the English Language 2246 (1942).

It appears to us from this definition that a 'symptom' is a meaningful term only because it is a 'symptom' in relation to something else. McLeod's  symptom of numbness became relevant as one the Plan used to exclude her from coverage based on a pre-existing condition only once it was deemed a 'symptom of MS.' If it were just a random 'symptom' of some undiagnosed ailment, then Hartford would not be concerned with it. Given that the symptom becomes a factor in the exclusion process only once it is tied to the diagnosis of the sickness, in this case MS, we do not see on what basis Hartford can successfully argue that there exists a significant difference between the language of the Hartford Plan and the language of the insurance policy in  Lawson. Indeed, the Hartford Plan still bases the exclusion on 'symptoms . . . for which you received Medical Care.' (emphasis added). This construction simply begs the obvious question: symptoms of what? Hartford offers no satisfactory answer to this question.

In  Lawson, we sought to avoid precisely the type of ex post facto denial of benefits that Hartford has undertaken here:

'Although we base our decision on the language of the policy, we note that considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during  the exclusionary period. 'To permit such a backward- looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.'

301 F.3d at 166 (quoting  Ermenc v. American Family Mut. Ins. Co., 221 Wis. 2d 478, 585 N.W.2d 679, 682 (Wis. Ct. App. 1998)).

While this statement is dicta, it was considered dicta, which we find persuasive. Consistent with  Lawson's persuasive reasoning, and the foregoing explanation of the rationale of applying it to an ERISA context, we hold that the phrase 'symptoms . . . for which you received Medical Care' in the Hartford policy necessarily connotes an intent to treat or uncover the particular ailment which causes that symptom (even absent a timely diagnosis), rather than some nebulous or unspecified medical problem. To hold otherwise would vitiate any meaningful distinction between symptoms which are legitimately moored to an  'accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance abuse,' and those which are not. It

is simply not meaningful to talk about symptoms in the abstract:
Seeking medical care for a symptom of a pre-existing condition can
only serve as the basis for exclusion from receiving benefits in a
situation where there is some intention on the part of the physician or
of the patient to treat or uncover the underlying condition which is
causing the symptom.

Such a holding does not mean that we require that a 'correct' diagnosis
be made before the effective date of a policy in order for an insurance
company to be able to deny coverage based on a pre-existing
condition. In Lawson, we explained the difference between a
'suspected condition without a confirmatory diagnosis' and 'a
misdiagnosis or an unsuspected condition manifesting non-specific
symptoms.' 301 F.3d at 166. Despite numerous consultations with
physicians and multiple MRIs which could have potentially revealed
the existence of MS before the effective policy date, neither McLeod
nor her physicians ever suspected that she was suffering the effects of
MS. Indeed, as we have explained  above, McLeod received on-going
treatment for a host of other ailments for the years preceding the MS
diagnosis with no suspicion on anyone's part that she was not receiving
proper medical care. Under those circumstances, we are confident that
McLeod's case is one either of 'misdiagnosis' or of 'unsuspected
condition manifesting non-specific symptoms' rather than a 'suspected
condition without a confirmatory diagnosis.' While there were
multiple opportunities for the presence of MS to be revealed through
the various testing McLeod underwent during the look-back period,
none of the tests ever linked the symptoms she was experiencing to
MS. We therefore conclude that the District Court erred as a matter of
law when it held that Hartford's determination that McLeod had
received medical care for symptoms of MS during the look-back
period was not arbitrary and capricious.

*McLeod v. Hartford Life & Accident Ins. Co.*,
372 F.3d 618, 625-628 (3d Cir., 2004)

*McLeod* requires that the condition which causes the disability be one which is known

during the pre-existing "lookback" period.  During the pre-existing time period here, Dr. Haddad was

known only to have right sided symptoms due to a herniation of C5-6 and a resulting radiculopathy.

There is nothing about this which would be expected to progress to the left side, and there was no

reason to suspect that the surgery would cause left sided symptoms.


**5. This Court Should Award Benefits Through the Entry of Judgment.**

Hartford purports to have denied only short term disability benefits, holding that the

pre-existing condition limitation applies, and therefore only six weeks of benefits is due. AR 39-41,

1    denial letter dated 11/12/2015, and AR 34-36, denial on appeal dated 5/18/16.  Because the pre-

2    existing condition limitation, if it applies to the short term disability, will bar any recovery of long

3    term disability, any effort to pursue a separate disability application and exhaust remedies separately

4    under that application would be futile.

5

6          ERISA itself does not require exhaustion of remedies.  *Vaught v. Scottsdale*

7    *Healthcare Corp. Health Plan,* 546 F. 3d 620, 626 (9th Cir., 2008).  But the federal courts "have the

8    authority to enforce the exhaustion requirement in suits under ERISA, and ... as a matter of sound

9    policy they usually should do so."  *Amaato v. Bernard,* 618 F. 2d 559, 568 (9th Cir., 1980).

10   There are exceptions to the prudential exhaustion requirement, and "there are occasions when a court

11   is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most

12   familiar examples perhaps being when resort to the administrative route is futile or the remedy

13   inadequate."  *Vaught* at 626-627, citing cases.

14

15

16         When exhaustion is required, it is not necessary for the insurer or the plan participant

17   to push every issue through the administrative processes.  In *Vaught,* for example, the plan

18   participant offered a number of reasons why the plan should reconsider its decision, but not the one

19   he raised for the first time in the district court, *id.,* at 629.  *Vaught* held that the requirement to

20   pursue administrative remedies was a "remedy-exhaustion" requirement and not a requirement for

21   "issue-exhaustion."  *Id.,* at 630.  An example of issue exhaustion is the rule that a litigant may not

22   raise an argument on appeal if it was not raised in the trial court.  "Remedy exhaustion" on the other

23   hand means merely that the plan participant must obtain a final decision on his claim.  *Ibid.*

24

25

26         The plan purports to have stopped its analysis once it determined that the claim was

27   lost because of the pre-existing condition limitation.  But the decision by the plan not to consider

28   other issues does not give it a ground now to request the Court to remand the short term claim so that

the plan can now consider the extent of disability.  The plan has made its final decision on the short term claim, and all issues are properly before the Court.

There is no evidence that the plan, had it proceeded formally to consider long term benefits, would have done anything other than apply the pre-existing condition limitation. Accordingly, it would have been futile for Dr. Haddad to press the plan for formal treatment of his long term claim.  The administrative remedies here for the long term claim were futile, and they need not be pursued.

We also note that Hartford's usual procedure when faced with both a short and long term claim, is to take the materials gathered on the short term claim and use them, as much as possible to adjudicate the long term claim.  See Padway Declaration, exhibit 1, Hartford Policy. As Hartford writes: "When a policy holder has both our STD and LTD coverage, it is our intent to provide coordinated management of both claims, including a timely transition into the LTD portion of the claim in required."  And, "[t]he LTD examiner should coordinate with STD Examiner to use the forms and information gathered during the STD process."  Padway Declaration, Exhibit 1.

Instead of the coordination which Hartford usually employs, it took no action to start processing an LTD claim.  And this is not surprising since such a claim would have run into the same pre-existing condition limitation which resulted in denial of the short term claim.

To file a long term claim requires that the plan participant provide (1) notice (AR 1106) and (2) proof of claim. AR 1101, 1106.   Notice of both a short term and long term claim were provided to Hartford by letter of January 12, 2016.  AR 924.  Proof of loss for the long term claim was made with Dr. Tay's letter of May 5, 2016, AR 543-544, and various supporting medical records which were submitted with a cover letter on May 10, 2016.  AR 119-120.

A number of cases have noted that it is not always necessary to remand the case to the plan at transition points, for example, the transition from "own occupation" to "any occupation." Sometimes, the Court's decision on the "own occupation" disability will control the result on the "any occupation" one. *Wright v. Raytheon  Co. Short Term Disability Plan*, 2008 U.S. Dist. LEXIS 81951 (D.Ariz. Sept.17, 2008) (short term and first part of long term disability had same definition of disability.  Therefore when short term decision was overturned, Magistrate recommended awarding long term without remand); *Oliver v. Coca Cola Company*, 497 F.3d 1181 (11th Cir. 2007) (upholding an award of benefits beyond the own occupation to any occupation transition, without a remand, citing "highly deferential" review of district court's decision to excuse exhaustion); *Smith v. Metro Life Ins. Co.*, 274 Fed. Appx. 251, 2008 U.S. App. LEXIS 8290  (4th Cir. N.C. 2008) (held: plaintiff did not have to exhaust "any occupation" when insurer denied "own occupation;" denial of any occupation implies denial of "any occupation," Record contained evidence supporting disability from "any occupation."); *Paese v. Hartford Life & Accident Ins. Co.* 449 F.3d 435 (2nd Cir., 2006) (awarding both own occupation and any-occupation benefits through bench trial date).

### 6. Interest.

Under ERISA, this Court has discretion to award prejudgment interest to compensate the plan beneficiary for the loss of the use of the benefits due.  *Dishmanv. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir.2001).  No one would call an interest rate which is less than 1% to be compensatory for a disabled consumer.  Dr. Haddad declares that he uses credit cards, the lowest of which has a 17% interest rate.  Further, his home mortgage charges a 4.25% rate. A minimally compensatory rate would be 5% or the 10 % rate used (1) by California Insurance Code 10110.2 for late disability insurance payments and (2) by statute for breach of contract.

The Ninth Circuit presumes that  "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the

trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Grosz-Salomon v. Paul Revere Life Insurance*, 237 F.3d 1154, 1164 (9th Cir., 2001). But there is no discussion about why this rate is fair in *Grosz-Salomon*, or any ERISA case which we could find. This presumption originated during the 1970s in maritime litigation, where the parties could reasonably be expected to borrow for very close to the one year T-bill rate. *Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F. 2d 1280, 1288 (9th Cir., 1984). The Ninth Circuit held:

> "Although the award of pre-judgment interest is within the discretion of the trial judge, this discretion must be exercised with a view to the fact that pre-judgment interest is an element of compensation, not a penalty. [Citations] An award of pre-judgment interest at below market rates does not fully compensate the prevailing party and, in addition, tends to discourage prompt litigation because delay gives an economic benefit to the debtor. [Citation.]

When the underwriters paid for the loss in *Western Pacific, the prime interest rate was 20%*. Id. The dispute was whether to use that rate, or the 8% rate which had been awarded by the district court.

The Western Pacific rule was brought to ERISA in *Blanton v. Anzalone*, 813 F. 2d 1574 (9th Cir., 1987), which was an action for breach of fiduciary duty by undercharging rent for a medical building. Blanton claimed that Anzalone breached his fiduciary duty by undercharging rent on a medical building. The Ninth Circuit assumed, without discussion, that the presumption of the one year treasury bill rate from Western Pacific was appropriate. Similarly, the rule was adopted in *Grosz-Salomon, supra,* without discussion of how a rate presumed adequate to compensate insurers might or might not be appropriate for disabled plan participants, who cannot borrow money at anything close to the one-year T-bill rate. The Ninth Circuit rejected *Grosz-Salomon's* argument that the fair rate was what the insurance company earned on the money it owed her, but as the Ninth Circuit explained in *Dishman, supra*, an award based upon the 16% return earned by the defendant was a punitive rate, not a compensatory one.

In recent years, of course the one year T-bill rate has been kept low by the federal reserve in an effort to stimulate the economy.  There have been instances of some central banks even using a negative rate for that purpose.  In any event, the current economic reality is that disabled persons cannot borrow at anything close to the one year T-bill rate, and no one would claim that this is a compensatory rate for someone who is out of work, and, if they win their disability case, they might collect between half and two thirds of their former income.  The disabled cannot borrow cheaply.  Most circuits, including the First, Second, Fourth, Fifth, Seventh, Tenth and Eleventh choose an interest rate by reference to state law in their ERISA cases.  *Radford Trust v. First Unum Life*, 321 F. Supp.2d 226 (D. Mass. 2004) (using 12% Mass. state interest rate); *Alfano v. CIGNA Life Ins. Co. of New York*, 2009 U.S. Dist. LEXIS 28118  (S.D.N.Y., 2009)[ 9% rate based on New York Law); *Quesinberry v. LINA*, 987 F.2d 1017, 1030-31 (4th Cir. 1993)(en banc) (12% based on Virginia law); *Hansen v. Continental Ins. Co*., 940 F.2d 971, 984 (5th Cir., 1991)(10% based on Texas law); *Billings v. Cont'l Cas. Co.*, 2003 U.S. Dist. LEXIS 796 (N.D.Ill., 2003) (using the 9% Illinois rate);  *Omasta v. Choices Benefit Plan,* 352 F. Supp. 2d 1201(D. Utah 2004) (10% rate by reference to Utah law); *Nightingale v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1484 (11th Cir., 1995) (using 18%  from Ala.Code § 27-1-17(b)).

A compensatory rate in this case would be Dr. Haddad's actual borrowing cost, which has a low of 4.25 % for his mortgage, or 17% for his credit cards.  Accordingly a reasonable interest rate would be 5% or 10%.  A 10% rate would equal what state law directs disability insurers to pay when they are late on disability payments.  Ins. Code 10110.2.

**7. Computations of amounts due**.

Dr. Haddad was hired by Sutter on July 28, 2014.  He became disabled on the date of his first surgery, March 5, 2015. The short term disability plan has a 30 day waiting period, and paid

six weeks of benefits, to May 16, 2015 which is the limit for pre-existing conditions.  In the absence of complications, Dr. Haddad would have been ready to return to work about the end of this six week period.  AR 755-756.  He had recovered "well" from surgery, and his left sided symptoms were mild in late April, AR 737, but much worse in late May.  AR 755-756.

Dr. Haddad's earnings from the date he started work at Sutter, July 28, 2014, through the end of that year were $227,827.15, AR 1056. Pre-disability earnings are based on earnings shown on form W-2 the year prior to becoming disabled.  AR 1113.  Both the short and long term plan pay 60% of predisability earnings which means Dr. Haddad qualifies for the maximum weekly benefit of $5,000 under the short term plan, and the maximum monthly benefit of $25,000. under the long term plan, AR 1097, with an offset for the state disability payments from May 17, 2015 to March 4, 2016, at $1104. per week or $157.71 per day.  This offset runs for 41 weeks * 1104= $45,264 plus 157.71 * 4= $630.84, for a total offset of $45,894.84.

The short term disability began on March 5, 2015.  There is a 30 day waiting period, so that benefits began on April 4, and these were paid for six weeks, until May 16.  Short term disability benefits are owed from May 17, 2015 until September 1, 2015, when the long term benefits begin (after a 180 day elimination period). This is 15 3/7 weeks @ $5,000 per week, or $77,142.85.

Long term benefits are due from September 2, 2015 until September 1, 2017 (estimated date for entry of judgment), or 24 months at $25,000 per month = $600,000.

Total of short term disability ($77,142.85) plus long term disability ($600,000) - SSDI offset ($45,894.84) = $631,248.01.  Interest on the short term net benefits of $60,388. ($77,500. - 15.5 weeks of SDI @ 1104/wk=17,112) from September 2, 2015 until September 1, 2017, at 5% compounded annually = $6189.77, or at 10% compounded annually, is $12,680.  Interest on long

term benefits from September 2, 2015 through September 1, 2016= $30,750 @ 5% compounded annually, or $63,000 at 10%.  Interest on long term benefits from September 2, 2016 through September 1, 2017 is $15,000 at 5% or $30,000 at 10%.

Total due as of September 1, 2017 is:

| | |
|---|---|
| Short Term Disability: | 77,142.85 |
| Long Term Disability: | 600,000.00 |
| SDI Offset        : | 45,894.84 |

_____

| | |
|---|---|
| Total without interest : | $631,248.01 |
| Interest @ 5%        : | $ 51,939.77 |
| Interest @ 10%       : | $105,680.00 |

**8.  Conclusion.**

No one could have predicted the progression of a right sided C6 disc herniation and radiculopathy into a left sided radiculopathy resulting from disc replacement surgery. There is no natural progression of a disease here, but rather an unforseen surgical complication.  No physician consulted with or treated Dr. Haddad for the left side symptoms which disabled him during the "look back" period.  The left sided symptoms are not a pre-existing condition, but are new symptoms caused by a complication of the March 5, 2015 surgery.

The Court should overturn the denial of benefits, and award benefits as shown in the above computations, together with prejudgment interest at a compensatory rate.  As a prevailing plan participant,  Dr. Haddad is entitled to recover his attorneys fees and costs "absent special

1   circumstances." *Smith v. CMTA-Iam Pension Trust,* 746 F. 2d 587 (1984).  The Court should award

2   costs and fees to be set in accord with F. R. C. P., Rule 54.

3

4

5                    Dated:  June 5, 2017             /s/ Laurence F. Padway

6                                                     Attorney for Fadi G. Haddad, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28