1
2
3
4                          UNITED STATES DISTRICT COURT

5                        EASTERN DISTRICT OF CALIFORNIA

6

7    FADI G. HADDAD,                              Case No. 16-cv-01700-WHO

8                   Plaintiff,

9           v.                                    **ORDER GRANTING DEFENDANT'S
                                                  MOTION FOR JUDGMENT**
10   SMG LONG TERM DISABILITY PLAN
     and HARTFORD LIFE AND ACCIDENT               Re: Dkt. Nos. 25, 26
11   INSURANCE COMPANY,

12                  Defendants.

13                                **INTRODUCTION**

14          The question in this ERISA denial of disability benefits case is whether disabling

15   symptoms caused by a surgery to treat a pre-existing condition fall under a limitation of benefits

16   for disabling symptoms "that result[] from, or [are] caused or contributed to by, a Pre-existing

17   Condition."  There is no dispute that: (1) plaintiff Dr. Fadi G. Haddad (Haddad) had a pre-existing

18   condition of cervical radiculopathy in the C5-6 cervical disk and that condition caused (prior to the

19   surgery) non-disabling but significant and deteriorating neck pain as well as pain and paresthesia

20   from the top of his right arm down to his right thumb; (2) the surgery he underwent in March 2015

21   was to alleviate the cervical radiculopathy by replacing the diseased disk, and that he was advised

22   pre-surgery that the operation carried risks of spinal injury and equipment failure; and (3) after

23   that surgery, Haddad's right side symptoms improved dramatically (or were totally alleviated) but

24   Haddad started to suffer from non-pre-existing and disabling symptoms on his left side stemming

25   from the C5-6 disk area.

26          Defendant Hartford Life and Accident Insurance Company (Hartford) contends that the

27   post-surgery disabling conditions were "caused or contributed to" by his pre-existing cervical

28   disease because the disabling conditions were the direct result of treatment/surgery to treat the pre-

1    existing condition.  Haddad asserts that because the symptoms that disabled him (left-side pain

2    and paresthesia) were not the symptoms that he sought the surgery for (right-side pain and

3    paresthesia), his coverage cannot be excluded by the pre-existing conditions limitation.  I conclude

4    that under the plain language of the Plan, the pre-existing condition exclusion applies because the

5    left side disabling symptoms were "caused or contributed to" by the treatment for the pre-existing

6    degenerative disk disease.  Hartford's motion for judgment is GRANTED and Haddad's motion is

7    DENIED.

8                                          **BACKGROUND**

9    **I.    THE PLAN**

10        Defendant Hartford Life and Accident Insurance Company (Hartford) issued a group life

11   and disability policy (Policy) to the Trustee of the Health Care Industry Group Voluntary Life and

12   Disability Insurance Trust (Trust or policy holder).  AR 1064-1167.  Hartford issued "certificates

13   of insurance" (Certificates) to covered employees, outlining the benefits available.  According to

14   Hartford, these Certificates compromise the ERISA plan (Plan).  Under the Plan sponsored by

15   plaintiff's former employer Sutter Medical Group (Sutter), short-term disability (STD) and long-

16   term disability (LTD) benefits were available.  Haddad became covered by the Plan on July 28,

17   2014, his first day of employment with Sutter.  AR 1058.

18        To be eligible for STD benefits under the Plan, an employee had to be unable to perform

19   their regular or customary work.  AR 1079-80.  Benefits were payable for up to 22 weeks, but only

20   six weeks if the disability was caused by a pre-existing condition.  AR 1071.  With respect to pre-

21   existing conditions, the Plan provided:

22   **Pre-Existing Conditions Limitation: Are benefits limited for Pre-existing Conditions?**
     We will only pay benefits, or an increase in benefits, under The

23   Policy for any Disability that results from, or is *caused or contributed to* by, a Pre-existing Condition for up to 6 week(s),

24   unless, at the time You become Disabled:

25   1) You have not received Medical Care for the condition for 6 consecutive month(s) while insured under The Policy; or

26   2) You have been continuously insured under The Policy for 12 consecutive month(s).

27

28   **Pre-existing Condition means:**
     1) any Injury, Sickness, Mental Illness, pregnancy, or episode of

                                              2

Substance Abuse; or
2) any ***manifestations, symptoms, findings, or aggravations related to or resulting from such*** Injury, Sickness, Mental Illness, pregnancy, or Substance Abuse; for which You received Medical Care during the 6 month(s) period that ends the day before:
1) Your effective date of coverage; or
2) the effective date of a Change in Coverage.

AR 1075 (***emphasis*** added).

The LTD Plan has a 180 days elimination period and provides coverage if the participant is unable to work in their "own occupation." AR 1097. The only substantive difference between the pre-existing condition limitation in the LTD and STD Plans is that medical care for a condition pre-coverage must have been within three months under the LTD Plan (as opposed to six month under the STD Plan). AR 1105.[1]

## II.    MEDICAL CONDITION AND CLAIM FOR STD

Haddad first experienced neck pain in 2013. AR 1048.[2] On July 1 2014, Haddad had a cervical spine X-ray and discussed his neck pain and right thumb numbness with pain with an orthopedic surgeon. AR 940-41, 945-46. The surgeon diagnosed mild right-sided C5-6 disk herniation. AR 940-41.[3]

---

[1] As discussed below, plaintiff challenges whether the Certificates produced by Hartford constitute the actual Plan at issue.

[2] In its response brief, Hartford relies on allegations made in a lawsuit Haddad is pursuing in the Eastern District of California, *Haddad v. Hilton Worldwide Holdings, Inc*., EDCA 16-cv-405 (Hilton Complaint). In that lawsuit, Haddad alleges that the damage to his C5-6 disk was sustained during a massage at a Hilton Hotel in Abu Dhabi. Hilton Complaint ¶¶ 19-22. Haddad also alleges that he has been unable to work since 2015 "as a result" of the injury he suffered during the massage. *Id*. ¶ 27. Haddad objects to Hartford's introduction of this evidence because it was not part of the administrative record and not included in Hartford's initial disclosures. Dkt. No. 30, ¶ 2. However, the complaint and case history are subject to judicial notice as court records and the objection is OVERRULED. *See Hunt v. Check Recovery Sys. Inc*., 478 F. Supp. 2d 1157, 1160-61 (N.D. Cal. 2007). Haddad also objects to Hartford's citation to a website as support for "known risks" of disk replacement surgery. Dkt. No. 30, ¶ 1. I do not rely on that website/citation, and the objection is OVERRULED as moot. Similarly, Haddad objects to inferences and legal assertions made by Hartford as being made outside the administrative record or without adequate citations. *Id*. ¶¶ 3-6. I do not rely on those arguments or evidence here, and these objections are likewise OVERRULED as moot.

[3] Dr. Tay characterizes Haddad's condition as "right arm radiculopathy in the C6 distribution, down to the right thumb, beginning in the fall of 2013." AR 541. Despite the difference in language, no one contends that there is a material distinction between Tay's characterization of Haddad's pre-operation condition and Haddad's July 2014 diagnosis. *See* Pl. Mot. [Dkt. No. 26] at 2-3 ("We do not contest that Dr. Haddad had a C5-6 radiculopathy which produced right-sided symptoms.").

3

United States District Court
Eastern District of California

1          On July 28, 2014, Haddad started working at Sutter as a pediatric gastroenterologist.  AR

2    1058.  From August through November 2014, Haddad continued to seek medical care for his

3    cervical radiculopathy that was causing him "mild right-sided C6 symptoms."  Haddad was being

4    evaluated by medical personnel for cervical traction units and treated with physical therapy.  AR

5    936-939, 942.  During this time, Haddad's symptoms progressed from only neck pain and

6    eventually included pain and paresthesia from the top of his right arm down to his right thumb.

7    AR 1048.  He treated the condition with physical therapy and anti-inflammatory medicines.  *Id*.  A

8    November 2014 MRI, performed because of Haddad's "neck pain with radiculopathy," showed

9    "severe right foraminal narrowing and compression" of the C6 nerve at the C5-6 level and "C5-6

10    disk herniation."  AR 942, 944.

11          By early 2015, Haddad's cervical problems were becoming more severe.  In January 2015,

12    he reported that his neck pain "worsened" with hyperextension and "more recently" he began

13    experiencing paresthesia from the right upper arm to his thumb. AR 1048; *see also* AR 942 (C5-6

14    examination).  During a January 27, 2015 consultation regarding surgical treatment, he was

15    diagnosed with "cervical radiculopathy" based on the MRI showing "foraminal narrowing at C5-

16    6."  AR 1049.  In March 2015, when discussing surgical options, Haddad described his symptoms

17    as having gotten worse over the last year.  AR 1046-47.  Again, based on his MRI, Dr. Cheng

18    diagnosed Haddad with "foraminal narrowing at the right C5-6 level as well as disk degeneration."

19    *Id*.  Haddad decided to undergo a C5-6 disk replacement and that operation was done by Dr.

20    Cheng on March 5, 2015.  AR 1043-47.  The postoperative diagnosis confirmed that Haddad had

21    "C5-6 stenosis with radiculopathy," and that a pre-operation MRI confirmed "severe stenosis."

22    AR 1043.  Prior to surgery, Haddad was informed that the surgery carried risks of spinal cord

23    injury and failure of instrumentation.  AR 1043.

24          On March 23, 2015, in a post-surgery appointment, Haddad reported that 95% of the right

25    sided symptoms had been alleviated, but that he was suffering from new "shooting pain"

26    symptoms.  AR 1041.  On review of imaging, the replacement disk appeared to be "flexed" but

27

28

1    within the range of normal. AR 1042. In April 2015, Dr. Cheng attributed Haddad's new

2    symptoms to "facet irritation and inflammation" following the surgery but indicated that he could

3    return to work. AR 383, 402. In May 2015, Dr. Cheng reported that Haddad's radiculopathy

4    symptoms were "completely resolved" but that he began having left-side neck pain and left-side

5    paresthesia, and issued a note extending Haddad's return to work through July. AR 401-02. On

6    August 20, 2015, Haddad underwent a second surgery performed by Dr. Tay to remove the

7    replacement disk and take other measures to attempt to solve the problem. AR 500. In September

8    2015, Haddad reported improved neck pain and imaging showed a stable C5-6 plate and allograft,

9    but discomfort still limited him from working. AR 527. In November 2015, Haddad reported

10   existing pain and inability to work, with physical therapy providing only a mild reduction in pain.

11   AR 528.

12       Prior to the March 5, 2015 surgery, Haddad applied for STD benefits. AR 1060-61. In

13   support of his claim, Haddad submitted an "attending physician statement" from Dr. Cheng that

14   noted his diagnosis as "cervical radiculopathy" with an onset date of July 2013. AR 183-185,

15   1063. Dr. Cheng's attending physician's statement (dated February 18, 2015), limited Haddad to

16   clerical/sedentary work prior to the "cervical fusion" surgery. AR 1063. On March 18, 2015,

17   Hartford notified Haddad that because his disability began within his first twelve months of

18   coverage, Hartford was going to conduct a pre-existing investigation. AR 116. Under the Plan's

19   STD coverage, the issue was whether Haddad had been treated for the cervical radiculopathy in

20   the six months prior to starting at Sutter (if not, there would be no pre-existing condition) and

21   whether Haddad had been treated for the condition during his first six months of his employment –

22   between July 28, 2014 and March 4, 2015.

23       Based on its investigation, Hartford applied the pre-existing condition limitation and

24   provided only six weeks of STD coverage. It reasoned that Haddad had received "medical care"

25   for the C5-6 disk herniation and the resulting and progressive stenosis in the six months prior to

26   his start at Sutter (therefore, he had a pre-existing condition) and that Haddad had received

27   medical care for the condition within the first six months of his employment at Sutter. AR 26. On

28   November 12, 2015, Hartford advised Haddad that only six weeks of benefits were payable under

5

1    the STD Plan as a result of his pre-existing condition.  AR 39-41.

2          On May 10, 2016, Haddad appealed that decision through Hartford's administrative

3    process.  AR 912-13.  Haddad argued there and argues now that his pre-existing condition was

4    limited to "right-side" non-disabling conditions that were 95% resolved with the surgery.  AR 912.

5    However, because the replacement disk inserted during the March 2015 surgery "flexed" or

6    because during the surgery new injuries were caused, Haddad now suffered disabling left-side

7    symptoms.   AR 912.  As part of the appeals process, Haddad submitted a May 5, 2016 letter from

8    Dr. Bobby Tay (the surgeon who performed the second surgery).  AR 912-15.

9          In his letter, Dr. Tay characterized the pre-surgery records as documenting right-sided

10    conditions, caused by foraminal stenosis on the right side of C5-6 disk, as well as a posterior disc

11    spur which "possibly or definitely" compressed the exiting right C6 nerve.  AR 914.  According to

12    Dr. Tay, this pathology explains Haddad's right arm and hand symptoms, but "would not produce

13    left arm symptoms" and there were no left-side symptoms.  *Id*.  Dr. Tay characterized Haddad's

14    post-surgery records (submitted to Hartford as part of the administrative appeal), as showing new,

15    left-side symptoms which were so severe as to prevent Haddad from working.  AR 914-15.  The

16    appearance of the left-side symptoms post-surgery was documented, according to Tay, on a post-

17    surgery EMG that showed a left-side C6 lesion which was not present on the imaging done prior

18    to the initial surgery.  AR 915.  Dr. Tay concluded that there was a left-side nerve root injury that

19    occurred during the March 5, 2015 disc replacement surgery.  *Id*.

20          On May 18, 2016, Hartford upheld its initial decision because "[t]hough the claimant may

21    not have had left sided symptoms before his 03/05/2015 surgery, they are the direct result of

22    Treatment for his Pre-existing cervical diagnosis."  AR 35.

23          This suit followed.  The following facts are undisputed:  (1) Haddad was diagnosed and

24    had been under treatment since 2013 for cervical radiculopathy in the C5-6 cervical disk; (2)

25    Haddad's pre-operation C5-6 radiculopathy only produced right-side symptoms that were not in

26    and of themselves disabling;[4] (3) there was no evidence of left C6 radiculopathy prior to the

27    _____

28    [4] Hartford attempts to cast some doubt on the significance and degree of the pre-surgery
     symptoms, noting that in Haddad's personal injury action, Haddad has complained of "constant

                                          6

surgery; and (4) the new, disabling left-side symptoms were likely the result of the operation,

caused by nerve irritation or injury while removing the diseased disk or installing the artificial

disk.

**LEGAL STANDARD**

Under Section 502 of the Employee Retirement Income Security Act ("ERISA"), a

beneficiary or plan participant may sue in federal court "to recover benefits due to him under the

terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A claim of denial of benefits in

an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the

[plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Under the *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan

administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458

F.3d 955, 963 (9th Cir. 2006). The normal summary judgment standard applies under *de novo*

review. *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

**DISCUSSION**

**I.     THE POLICY & PLAN TERMS**

As an initial matter, Haddad argues that because the actual Policy has not been produced in

this action but only Certificates summarizing the Plan terms have, "broader latitude" should be

granted to him in interpreting the terms of the Plan because of the "inherent lack of precision"

caused by forcing him to rely on the summary Certificates. Pl. Tr. Br. at 8.

According to Haddad, the "Plan" produced by defendants is a booklet containing the

applicable Certificates entitled "Your Benefit Plan." The Certificates state that:

> The provisions of the Participating Employer's coverage under The
> Policy, which are important to You, are summarized in this

---

pain" since the 2013 injury and that two weeks prior to his first surgery Dr. Cheng signed an attending physician statement noting that Haddad had an impairment in his functionality due to the disk disease and that he was capable only of clerical work until surgery. AR 1063. However, for purposes of ruling on this motion, I assume that plaintiff's symptoms were not disabling prior to surgery.

1
2
3

> certificate consisting of this form and any additional forms which have been made a part of this certificate...The Policy alone is the only contract under which payment will be made. Any difference between The Policy and this certificate will be settled according to the provisions of The Policy on file with Us at Our home office.

AR 1069 (STD), 1095 (LTD), 1127 (Life Insurance).

4
5

The ERISA section of the booklet states:

6
7
8

> The benefits described in your booklet-certificate(booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions. The policy is incorporated into, and forms a part of, the Plan.

AR 1152. Under "Plan Name," this same page states: "Group Short Term Disability, Long Term

9
10

Disability, Basic Term Life, Supplemental Dependent Life, Supplemental Term Life Plan for

employees of Sutter Medical Group." AR 1152.

11
12

Haddad argues that Hartford's repeated refusal to produce the Policy means that Hartford

13

cannot meet its burden to prove that the STD pre-existing condition language described in the

14

Summary Plan/Certificate is the same as in the Policy. Relatedly, he argues that because the

15

Policy has not been produced, the existence of a "conspicuous, plain and clear" exclusionary

clause is drawn into question.

16
17

Haddad does not (and cannot) contend that the pre-existing conditions limitation in the

18

STD Plan is not conspicuous. It is. As to the "Policy," Hartford asserts that it did not need to

19

produce the Policy because the Certificates define and clearly set out the terms and governing

principles for benefits under the ERISA STD Plan for Sutter employees.[5] Hartford Resp. Br. at 12

20
21

& n.9. However, in a supplemental declaration provided by Hartford after the close of briefing,

22

Patricia M. Pfeifer declares that the Policy at issue was issued in 1994, and for each employer "an

23

amendatory rider is added to the policy incorporating the terms of its certificates and making it

24

part of the policy." Pfeifer Decl. [Dkt. No 31-1] ¶ 2. Pfeifer attaches the 2004 Policy as Exhibit 1

25

to her declaration. Under the terms of that Policy, the Certificates – the documents produced in

26
27
28

---

[5] The parties dispute when Haddad asked for the Policy to be produced. Haddad's counsel claims he requested it on January 12, 2016, as part of a request for all relevant documents. Ex.2 to Padway Decl. [Dkt. No. 28-1]. Hartford argues that the specific request for the Policy was not made until after discovery-cut off and on the eve of briefing these motions. Hartford Resp. Brief at 12, n.9.

1    this case – control the coverage provisions, eligibility and effective date provisions, termination

2    provisions, exclusions, and other policy provisions relating to state and federal insurance

3    requirements. *Id*. ¶ 4; Ex. 1 p. 5.  Pfeiffer admits that Hartford reissued the Policy to the Trust in

4    2008 and that she could not locate a copy of the current Policy, but she did locate the amendatory

5    rider that incorporates Sutter's Certificates applicable to Haddad. *Id*. ¶ 5.

6         At oral argument, plaintiff argued that because both the Plan and the 2004 Policy have

7    language indicating that the *other* document governs in case of dispute, there is no definitive

8    answer as to how the pre-existing condition language should be interpreted and plaintiff's

9    proposed interpretation (essentially reading out the "caused or contributed to" language) should

10   govern.  However, plaintiff's counsel agreed that there was no language in the 2004 Policy that

11   would change the interpretation or application of the pre-existing condition language in the Plan.

12   Moreover, when read together, the Plan and the 2004 Policy are consistent; *exclusions* are to be

13   determined under the language of the Plan. 2004 Policy at p. 5.  Finally, the Certificates

14   explaining the terms of the Plan that were in effect after the 2008 Policy reissuance (and that were

15   produced in this case) maintained the same pre-existing condition exclusion language.

16        As such, I will not apply "broad latitude" and adopt plaintiff's reading of the pre-existing

17   condition exclusion that essentially reads out the "caused or contributed" language from the Plan.

18   **II.    HARTFORD'S STD DECISION**

19        Given the language of the STD Plan and the undisputed evidence, I conclude that the

20   symptoms that Haddad claims are disabling – the left-side pain and parenthesis and neck pain –

21   were "caused or contributed to" by Haddad's pre-existing condition, the diseased C5-6 disk.  The

22   surgery that Haddad alleges caused his new, disabling problems was undertaken in order to

23   alleviate the C5-6 disk problem.  That Haddad was further injured as a result of that treatment,

24   does not preclude application of the pre-existing condition limitation.

25        This conclusion is consistent with district court cases that have addressed this issue on

26   similar facts under similar policy language.  For example, in *Breen v. Santander Glob. Facilities*,

27   No. CIV.A. 10-12032-RGS, 2012 WL 1857403, at *1 (D. Mass. May 22, 2012), the plaintiff

28   sought pre-coverage treatment for back pain and was diagnosed with multiple lumbar disk

9

1    herniations with radiculopathy.  Plaintiff claimed that post-coverage and post-surgery he became

2    disabled and contended that his "disability diagnosis of post laminectomy syndrome did not

3    directly result from pre-existing degenerative disk disease, but instead from his less than

4    successful back surgery, which occurred after coverage attached under the Policy." *Id* at \*5.

5    Applying the highly deferential abuse of discretion standard, the court concluded that "it was not

6    unreasonable, much less arbitrary and capricious, for Liberty to have concluded that Breen's post-

7    operative lower back disk problems were proximately caused by his preexisting lower back disk

8    problems." *Id*. at \*6; *see also Topazian v. Aetna Life Ins. Co*., No. 10 C 4702, 2011 WL 3419375,

9    at \*6-8 (N.D. Ill. Aug. 1, 2011) (affirming denial under deferential abuse of discretion standard

10   because plaintiff "long suffered from problems in the lower lumbar region of his spine" and while

11   plaintiff's "condition may have changed" and indeed worsened with new symptoms appearing "as

12   a result of his most recent surgery, it was not unreasonable for Aetna to conclude that this was

13   merely an exacerbation of a previous condition, not an entirely new one.").

14          Similarly, in *Bannon v. Assurant Employee Benefits*, No. CIV.A.09-6666, 2010 WL

15   2037548, at \*1 (E.D. La. May 20, 2010), the court, applying the deferential abuse of discretion

16   standard, concluded that a policy limitation excluding payments for "any disability resulting,

17   directly or [in]directly, from a pre-existing condition" excluded coverage for a disability caused by

18   lithium toxicity resulting from a medication  plaintiff took to treat his pre-existing bipolar

19   condition.  The court found that because "the [] policy by its terms extends to related conditions

20   and disabilities that result indirectly from them, the facts in the Administrative Record justify

21   application of the Pre–Existing Condition with the resulting limitation of benefits," as lithium

22   toxicity was a "related condition" to the bipolar disorder and the disability resulted indirectly from

23   the bipolar disorder.  *Id*. at \* 6.

24          Finally, in *Rose v. Hartford Life & Accident Ins. Co*., No. 11-CV-02905-WJM-CBS, 2014

25   WL 2609628, at \*3 (D. Colo. June 11, 2014), the district court affirmed a denial of benefits for a

26   pre-existing condition under de novo review.  The pre-existing condition policy language was

27   materially similar to the one here.  In *Rose*, the plaintiff had "a long history of problems with her

28   spine, including thoracic kyphosis, which is a severe curving of the spine." *Id*. at \*6.  After

10

1    reviewing the medical evidence, the court found substantial evidence to affirm Hartford's denial

2    on the basis that plaintiff's disabling neck pain "results from, or is caused or contributed to by" her

3    compensation for the thoracic kyphosis. *Id*. at \*7.

4         Haddad argues that these district court cases are irrelevant as they are not binding

5    precedent. He distinguishes *Breen*, *Bannon*, and *Topazian* because they were decided under the

6    more deferential abuse of discretion standard. And he asserts argues that *Rose* is inapposite

7    because in that case plaintiff's neck pain was a "natural progression" of her curved spine, whereas

8    here it was the surgery – not a natural progression of the disk disease – that caused a new injury

9    and led to the left-side symptoms.

10        That said, I find the referenced district court opinions persuasive. The *Breen*, *Bannon*, and

11   *Topazian* opinions did not necessarily turn on the deferential standard applied. They relied on

12   what a reasonable interpretation of "caused or contributed to" is, as applied to conditions that have

13   worsened due to treatment or progression of a disease.

14        Here the relevant facts are not in dispute. The language of the Policy is not in dispute.

15   The "caused or contributed to" language from the Plan is clear and unambiguous. It was applied

16   by Hartford to the facts based on substantial evidence connecting Haddad's left-side symptoms,

17   which occurred immediately after the initial operation to address his pre-existing disk disease

18   condition, to his pre-existing disk disease.

19        Haddad encourages me to follow *Fought v. UNUM Life Ins. Co. Of Am*., 379 F.3d 997

20   (10th Cir. 2004). There, following elective heart surgery, the plaintiff developed a severe staph

21   infection. The district court granted summary judgment to the insurer who had denied the

22   disability claim, concluding that plaintiff "suffered from a pre-existing coronary artery condition

23   that 'caused,' 'contributed to,' or 'resulted' in" her disability because the staph infection was a

24   result of the coronary bypass surgery. *Id*., at 999 - 1001. The Tenth Circuit reversed. As framed

25   by the Tenth Circuit:

26             The major difficulty presented by this case is that UNUM's policy
               excludes coverage for disabilities caused by pre-existing conditions,
27             whereas it seeks here to apply its policy as if it excludes coverage
               for disabilities caused by complications from surgery for pre-
28             existing conditions. Surgery is not, of course, a pre-existing

                                        11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> condition, but at most a necessary consequence of a pre-existing
> condition. In essence, therefore, this case becomes a matter of where
> we draw the line on chains of causation.

*Id*. at 1009. The chain of causation there contained five very attenuated stages. *Id*. ("The failure of non-surgical alternatives, initially successful elective surgery, later complications from that surgery, initially successful treatment of those complications, and finally a drug resistant infection due to those complications, which in itself may have been caused by the intervening presence of Staphylococcus aureus due to faulty sterilization, sanitation, etc."). The Tenth Circuit concluded that accepting that extremely attenuated causal link "would effectively render meaningless the notion of the pre-existing condition clause by distending the breadth of the exclusion." *Id*. at 1010. Rejecting the long chain of causal links in Fought's case, with intervening causes, the court instead held that "the disabling condition must be substantially or directly attributable to the pre-existing condition." *Id*. at 1011; *see also Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637 (8th Cir.1997) (applying pre-existing condition exclusion where the pre-existing condition (diverticula) was a "necessary precursor" and cased a complication and secondary condition (diverticulitis) to develop).

As Hartford argues, and contrary to Haddad's interpretation, the *Fought* case actually supports application of the pre-existing condition exclusion here. First, the causal chain with Haddad's disability is much shorter and does not involve unanticipated intervening causes or results such as those that flowed from the faulty sterilization/sanitation resulting in Fought's staph infection. Here, the disabling conditions flow directly from the fact that Haddad had a diseased C5-6 disk that required surgery. That the surgery did not work and/or exacerbated Haddad's symptoms does not mean his disabling symptoms were not caused or contributed to by his C5-6 disk disease.

Second, Haddad was advised that surgery to treat his diseased disk could result in spinal injury or failure of instrumentation. AR 1043. The *Fought* court distinguished cases which held that well-known complications from a disease – such as glaucoma following from diabetes – would trigger the pre-existing condition exclusion but unrelated "complications from treatment or surgery" would not. *Id*. at 1011. Here, Haddad had disk disease between the C5-6 vertebrae that

12

United States District Court
Eastern District of California

1    caused radiculopathy of the C6 nerve, although that radiculopathy only caused symptoms on his

2    right side.  He had an operation to remove the diseased disk, but that surgery likely caused a

3    connected and known complication, altering the nature and degree of his symptoms. [6]

4         Haddad also relies on *McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618, 620 (3d Cir.

5    2004).  There, interpreting slightly different language under a heightened abuse of discretion

6    standard of review, the Third Circuit rejected an argument that "receiving medical care 'for

7    symptoms' of a pre-existing condition encompasses receiving care for symptoms that no one even

8    suspected were connected with the later diagnosed ailment but which were later deemed not

9    inconsistent with it."  *Id*. at 624.  In *McLeod*, the plaintiff was treated for numbness in her arm by

10   a doctor who had for many years also treated plaintiff for "cardiac insufficiency" and for multiple

11   bulging cervical discs.  *Id*. at 621.  Post-coverage, plaintiff was diagnosed with multiple sclerosis

12   (MS), which in retrospect accounted for many if not most of her symptoms.  *Id*.  However,

13   because McLeod had never been treated pre-coverage for her "condition" of MS and MS had

14   never been considered a potential diagnosis, the fact that some of her MS-symptoms had been

15   treated did not suffice to trigger the pre-existing condition exclusion.  *Id*. at 628.

16        The *McLeod* court's analysis of different policy terms and an unsuspected condition is not

17   apposite.  Here, Haddad received pre-coverage care for symptoms of a diagnosed condition; C5-6

18   disk disease.  That the symptoms of his disease were confined (pre-surgery) to his right side and

19   after the unsuccessful treatment shifted to his left side and became more severe does not mean that

20   his C5-6 disk disease and C6 root compression were not pre-existing.

21        Finally, as opposed to the proximate cause standard adopted in *Fought*, in his response

22   brief Haddad appears to advocate for application of the common law "process of nature" rule to

23   define when a disability is "related to or resulting from" a pre-existing condition. [7]  "Related to or

24   _____

25   [6] Haddad argues that if accepted, Hartford's argument would exclude coverage in a case where a
     pre-existing condition leads to surgery and in surgery "an anesthesia misadventure" leads to
26   paralyzed vocal cords.  Pl. Resp. Br. at 5.  That hypothetical is more far close to the attenuated
     causal links in the *Fought* case than the close casual connection here.

27   [7] For his definition of the "process of nature rule," Haddad relies on *McClure v. Life Ins. Co. of N.
     Am*., 84 F.3d 1129, 1135 (9th Cir. 1996).  There, the Ninth Circuit considered an accidental death
28   and disability policy that insured against loss "resulting directly and independently of all other

13

1  resulting from" is not the relevant language at issue in this case. The language Hartford applied is

2  "caused or contributed to by, a Pre-existing Condition." AR 1075. The question, therefore, is not

3  limited to what symptoms a natural progression of Haddad's C5-6 disk disease might have caused,

4  but whether his disabling C6 condition was "caused or contributed to" by his C5-6 disk disease.

5  Hartford's interpretation of the Plan language was reasonable. And its determination was based

6  on substantial evidence that is not undermined by any dispute of fact or contrary evidence raised in

7  the administrative appeals process by Haddad.

8  **CONCLUSION**

9       For the foregoing reasons, Hartford's motion for judgment is GRANTED and Haddad's

10  motion is DENIED. [8]

11       **IT IS SO ORDERED.**

12  Dated: August 22, 2017

13

14

William H. Orrick
United States District Judge

15

16

17

18

19

20

21

22

23

24  causes from bodily injuries caused by accident," where the insurer argued that because the
plaintiff had a pre-existing back condition, his disability did not result "directly and

25  independently" from the accident. However, the Ninth Circuit did not reach the issue on the
merits and instead remanded to the district court to determine whether the "directly and

26  independently" language appears in such a "clear, plain and conspicuous" manner so as to defeat

27  plaintiff's "otherwise reasonable expectation of coverage." *Id*. at 1136.

28  [8] As his motion for STD benefits is denied, I do not reach Haddad's other claims for LTD benefits
and interest at a certain rate.